JOHN E. KUHN, JR.
United States Attorney

CHARISSE ARCE
JENNIFER IVERS
Assistant U.S. Attorneys
KARLA G. PERRIN
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: Charisse.Arce@usdoj.gov
         Jennifer.Ivers@usdoj.gov
         Perrin.Karla@epa.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,  <br><br>Plaintiff,  <br><br>vs.  <br><br>MICHAEL WAYNE HANZUK, II,  <br><br>Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. 3:22-cr-00009-SLG-KFR  <br><br>COUNT 1:  <br>CONSPIRACY TO VIOLATE THE  <br>CLEAN AIR ACT  <br>    Vio. of 18 U.S.C. § 371 |

I N F O R M A T I O N

The Grand Jury charges that:

# COUNT 1

## A. Overview

1. From on or about July 2019 and continuing up to on or about September 2020 within the District of Alaska, the defendant, MICHAEL WAYNE HANZUK, II ("HANZUK"), conspired with others known and unknown to the government to tamper with federally-mandated monitoring devices on both private and commercial diesel vehicles and remove required air pollution control equipment in violation of the Clean Air Act.

2. HANZUK was one of three owners and operators of ARM RIPPIN TOYS, INC., an automotive shop specializing in modifying, repairing, and maintaining diesel vehicles. ARM RIPPIN TOYS, INC. was an Alaska corporation formed with the Alaska Secretary of State in March 2018.

3. Within ARM RIPPIN TOYS, INC., HNAUK and another owner were responsible for online sales and marketing, including direct website sales, social media direct sales, social media advertising, and other sales and marketing sources. The sales included equipment and devices used to defeat, remove, and replace air pollution control equipment on diesel vehicles while the marketing was aimed at diesel vehicle owners. The other owner was responsible for overseeing repairs and maintenance of vehicles being serviced by the business as well as managing employees.

## B. Regulatory and Statutory Background

4. The Clean Air Act protects the nation's air quality by, among other things, reducing vehicle emissions that pollute the air with pollutants such as nitrogen oxides,

particulate matter, non-methane hydrocarbons, and carbon monoxide. These pollutants have been shown to cause cancer, as well as lung, neurological, cardiovascular, and immune system damage. Diesel exhaust is one of the largest sources of particulate matter and other pollutants.

5. The Clean Air Act directs the United States Environmental Protection Agency (EPA) to issue regulations limiting the amount of pollutants that motor vehicles, including diesel vehicles, can emit. To meet these standards, diesel vehicle and engine manufacturers have developed a variety of emissions control equipment, including devices known as selective catalytic reduction systems (SCRs), diesel particulate filters (DPFs), and exhaust gas recirculation systems (EGRs). Together, these hardware emissions control devices, along with others, make up a diesel vehicle's emissions control system and are critical to ensuring that the vehicle complies with the Clean Air Act's emissions standards.

6. EPA regulations also require vehicle and engine manufacturers to install on their vehicles and engines monitoring devices known as on-board diagnostic systems (OBDs). The OBD is a computer-based system that monitors the operation of both the engine and emission control components. The OBD is composed of software and sensors that monitor emissions-related engine systems and components. The OBD system operates within a vehicle's electronic control module (ECM) which is essentially an on-board computer that receives inputs from various sensors and sends outputs through activators to control engine, vehicle, or equipment functions, including emission control components.

7. The OBD alerts the driver if any of the vehicle's emissions control equipment has malfunctioned in some way. When this occurs, a malfunction indicator

light (MIL) or "check engine light" will illuminate on the vehicle's dashboard. The MIL will remain illuminated unless or until the malfunction is remedied. The OBD will also record a diagnostic trouble code (DTC) in the vehicle's computer. The MIL and DTC facilitate the detection and diagnosis of the malfunction, and the disabling of these functions serves to conceal the tampering of the emissions control system. Indeed, in some situations, if the malfunction is not addressed, the OBD can force the vehicle's engine into a state known as "limp mode," which limits the maximum speed of the vehicle to as low as five miles per hour, incentivizing the driver to repair the malfunction.

**C.    Emissions System "Deletes" and "Tunes"**

8.     Persons seeking to evade the Clean Air Act's pollution controls have developed methods of modifying or removing emissions control systems and rendering the OBDs inaccurate. These modifications are often marketed to diesel vehicle owners as improving the horsepower, torque, and other characteristics of diesel engines. These unlawful modifications result in a dramatic increase in multiple pollutants being emitted by each vehicle.

9.     One method of disabling a manufacturer-installed emissions control system is to remove the portion of the vehicle's exhaust system that contains the emissions control equipment and replace it with a section of exhaust tubing known as a "straight pipe" or "race pipe." These replacement pipes do not contain emissions control hardware. The act of removing or disabling a vehicle's emissions control system is often referred to as a "delete." Such a "delete" can increase particulate matter (PM) by a factor of approximately 40 times, nitrogen oxides (NOx) by a factor of approximately 310 times,

carbon monoxide (CO) by a factor of approximately 120 times, and non-methane hydrocarbons (NMHC) by a factor of approximately 1,100 times.

10. If a vehicle is deleted, the sensors contained in those deleted emissions control components are also disconnected. Thus, a properly functioning OBD will detect the malfunction or removal of the emissions control equipment and, in certain instances, cause the vehicle to go into limp mode. Therefore, in order to prevent a diesel vehicle from detecting that the emissions controls have been removed or disabled, the mechanic performing a delete must also modify the OBD by reprogramming it. The act of modifying the OBD in this way is often referred to as "tuning" or "flashing."

**D. The Conspiracy**

11. Beginning at a time unknown, but no later than July 2019, and continuing until at least September 2020, at Anchorage, within the District of Alaska, and elsewhere, the defendant, HANZUK and others known and unknown to the government, did knowingly, combine, conspire, confederate and agree with each other, to modify and delete the emissions control systems of diesel vehicles and further agreed to knowingly falsify, tamper with and render inaccurate the vehicles' OBDs, that is, monitoring devices and methods required to be maintained under the Clean Air Act in violation of Title 42, United States Code, Section 7413(c)(2)(C).

12. The object of the conspiracy was to generate revenue for ARM RIPPIN TOYS, INC. by charging a fee to delete and tune diesel vehicles.

E.  **Manner and Means**

It was part of the conspiracy that:

13. HANZUK and others agreed with diesel vehicle owners (customers) that, in exchange for a fee of between approximately $1,140 and approximately $5,445 per vehicle, ARM RIPPIN TOYS, INC. would remove emissions control systems from the customers' vehicles and render inaccurate the vehicles' OBDs.

14. HANZUK and others purchased and caused ARM RIPPIN TOYS, INC. employees to purchase straight pipes, race pipes, exhaust gas recirculation delete kits, block off plates, and other hardware intended for emissions system modifications.

15. HANZUK and others ordered tuning platforms as well as tuning software files from suppliers, which the suppliers then delivered by email or other electronic transmission.

16. HANZUK and others caused ARM RIPPIN TOYS, INC. mechanics to perform deletes on diesel vehicles by removing their emissions control components and replacing the relevant portion of the exhaust system with straight or race pipes.

17. HANZUK and others downloaded and caused to be downloaded tuning software onto cell phones or other computers. The software was then used to modify, tamper with, and render inaccurate the vehicles' OBDs in a manner that allowed the vehicles to function without the "check engine light" or MIL illuminating or the vehicle going into "limp mode," despite the removal of emissions control equipment.

18. HANZUK and others collected fees from customers totaling approximately $100,000 for performing unlawful deletes and tunes on diesel vehicles performed between about July 2019 and about September 2020.

**F.  Overt Acts**

19. In furtherance of the conspiracy, and to accomplish one or more of its objects, HANZUK and others known and unknown to the government, undertook, and caused to be undertaken, one or more of the following overt acts, which are representative of defendants' various acts in furtherance of the conspiracy, at Anchorage and elsewhere within the District of Alaska:

a. On or about October 23, 2019, HANZUK sent an email to Meyer Distributing, an automotive parts company, providing a credit card number for payment on multiple orders, including a 4-inch diameter straight pipe and a "Proven Diesel EZ Lynk Package" for a 2013 Ford F-250 Super Duty.

b. On or about October 30, 2019, ARM RIPPIN TOYS, INC. performed a delete and tune on a 2014 Ford F-350 Super Duty.

c. On or about November 19, 2019, ARM RIPPIN TOYS, INC. performed a delete and tune on a 2015 GMC Sierra 2500.

d. On or about March 6, 2020, ARM RIPPIN TOYS, INC. performed a delete and tune on a 2013 GMC Sierra 3500.

e. On or about June 3, 2020, HANZUK prepared Invoice #1104 for work on a 2015 GMC Sierra 2500 including "SOTF switch", "EZ Lynk w/ life time support", "custom exhaust", and "EGR Solution Kit w/ up-pipe."

f. On or about June 8, 2020, HANZUK prepared Estimate #1112 for a 2012 Ford F-350 Super Duty that included "EZ Lynk single flash" and "4" exhaust kit."

g. On or about June 8, 2020, HANZUK sent Estimate #1112 to the customer via electronic message.

All of which is in violation 18 U.S.C. § 371.

DATED this 2nd day of March, 2022, at Anchorage, Alaska.

JOHN E. KUHN, JR.
United States Attorney

s/ *Charisse Arce*
CHARISSE ARCE
JENNIFER IVERS
United States of America
Assistant U.S. Attorney

s/ *Karla G. Perrin*
KARLA G. PERRIN
United States of America
Special Assistant U.S. Attorney